# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
CHARLISE ELLIS, parent and next
friend of X.G., a minor,

             Petitioner,

v.

SECRETARY OF HEALTH
AND HUMAN SERVICES,

             Respondent.
* * * * * * * * * * * * * * * * * * * *

No. 13-336V
Special Master Christian J. Moran

Filed: June 24, 2019

Attorneys' fees and costs, reasonable
basis, genetic condition

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioner;
Darryl R. Wishard, United States Dep't of Justice, Washington, DC, for respondent.

**PUBLISHED DECISION AWARDING IN PART AND
DENYING IN PART ATTORNEYS' FEES AND COSTS**[1]

     Charlene Ellis unsuccessfully alleged that the diphtheria-tetanus-acellular pertussis (DTaP) vaccination caused her son, X.G., to suffer a seizure disorder. As the Vaccine Act permits, Ms. Ellis seeks an award of attorneys' fees and costs, totaling $117,521.44. The Secretary opposes in part. She is awarded $80,556.56.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

## I.     Medical Background[2]

X.G. was born with two genetic mutations, one known as MED13L. These mutations were discovered when he was five years old in 2016.

X.G. was also born with a second and independent problem, an infection with cytomegalovirus (CMV). CMV probably caused a migration disorder and microcephaly. A migration disorder means the neuronal circuitry in his brain is not correct. Microcephaly means that his brain is small.

On April 8, 2011, X.G. was eight months old. The doctor identified "delayed development." Exhibit 14 at 59. The doctor also ordered X.G. to receive his third dose of DTaP. Id. at 64 (vaccination chart).

The next day, X.G. had seizures. Exhibit 5.2 at 148 / pdf 61. An MRI revealed abnormalities. Id. at 145 / pdf 58.

Since then, X.G. has had seizures intermittently. He is also developmentally delayed. Exhibit 45 at 60-64.

## II.    Procedural History

The course of litigation can be divided into three phases. First, the parties developed their cases and prepared to proceed to a hearing on entitlement. However, these preparations were interrupted by the discovery of genetic information about X.G. This discovery starts the second phase of the litigation, which continued through the decision denying entitlement. The third phase concerns the litigation over attorneys' fees.

### A.     From Petition through Planning for a Hearing

Ms. Ellis's petition initially sought compensation for two conditions: a seizure disorder and developmental delay. The petition alleged alternative causes of action—the DTaP vaccine either caused or significantly aggravated an underlying condition. Pet., filed May 17, 2013.

---

[2] The September 6, 2018 Entitlement Decision set out the sequence of events in X.G.'s life and the procedural history in considerable detail.

2

The Secretary reviewed the evidence and recommended that compensation be denied. In his analysis, the Secretary identified the in utero CMV infection as an alternative cause for X.G.'s seizures and developmental delay. Resp't's Rep., filed Nov. 22, 2013.

The parties proceeded to retain experts. Ms. Ellis retained three doctors, Marcel Kinsbourne, Karen Harum, and Patrick Barnes. The Secretary retained one doctor, Elaine Wirrell.

After the parties appeared to finish the production of reports from experts, the parties planned to proceed to a hearing. As part of this process, the undersigned ordered the parties to submit various material before the hearing, such as updated medical records and a pre-hearing brief. Orders, issued Sep. 21, 2016 and Oct. 28, 2016.

### B.  Discovery and Disclosure of Genetic Mutation

On April 21, 2017, Ms. Ellis filed updated medical records (exhibits 44-45), a supplemental report from Dr. Harum (exhibit 46), and a supplemental report from Dr. Kinsbourne (exhibit 47). These records affected the remainder of the case.

Exhibit 45 contains a record from pediatric neurologist, Eric James Mallack. Dr. Mallack said X.G. was diagnosed with MED13L syndrome based upon genetic testing. Exhibit 45 at 75. However, the supplemental reports from Dr. Harum and Dr. Kinsbourne did not discuss the MED13L problem. See exhibits 46-47; see also Fee Appl. at 82 (Dr. Harum invoice not discussing these medical records), at 94 (Dr. Kinsbourne invoice also not discussing these medical records).[3]

---

[3] Mr. Gage represented that he talked to the experts about the ramifications of the MED13L diagnosis, starting April 2017. Pet'r's Memo., filed Feb. 22, 2019. However, the accuracy of this representation is questionable. First, the timesheets do not describe any conversations particularly about this topic. See Fee Appl. at pdf 23 (Mr. Gage's timesheet), at pdf 82 (Dr. Harum), and at pdf 94 (Dr. Kinsbourne). Dr. Kinsbourne lists his review of exhibit 45 after he reviewed Dr. Wirrell's report in May 2017. Second, Mr. Gage also represented that people in his office did not remember the circumstances of filing documents from around this time. Therefore, it seems inconsistent that he would only remember speaking with his experts. Third, the pre-hearing brief appears to assert a claim that the vaccines significantly aggravated X.G.'s developmental delay. See Pet'r's Pre-hear'g Br., filed Apr. 24, 2017, at 14. But, as discussed in more detail in the text, when Dr. Kinsbourne learned about the MED13L mutation,

While Ms. Ellis's attorney and her experts seem to overlook or to ignore the MED13L mutation, Dr. Wirrell was more attentive. Her supplemental report, filed just one week later, stated that mutations in MED13L are associated with an increase of developmental delay and epilepsy. Exhibit AA at 2.

Dr. Kinsbourne responded. He agreed with Dr. Wirrell that an MED13L mutation is associated with developmental delay. Thus, because X.G. possessed two factors separately associated with developmental delay (the CMV infection being the other), Dr. Kinsbourne could no longer opine that the DTaP vaccine caused or significantly aggravated X.G.'s developmental delay. Exhibit 57 (Dr. Kinsbourne's report dated June 28, 2017). On the other hand, Dr. Kinsbourne asserted that "The MED13L syndrome does not feature epilepsy as one of its manifestations. Therefore I continue to adhere to the opinion that … X.G.'s seizure disorder was caused by the DTaP vaccination." Id.

About one week after filing Dr. Kinsbourne's report, Ms. Ellis filed a motion for ruling on the record. She stated that she "will no longer be pursuing a claim for developmental delay." She asserted that "Petitioner has submitted all the evidence that petitioner believes the special master needs to issue a ruling in this case on the issue of the introduction of seizures." She requested that the special master allow the parties to submit briefs and to cancel the hearing scheduled for August 2017. Pet'r's Mot., filed July 5, 2017.

However, in fact, the record was not complete. Mr. Gage's office had already received the Ambry Genetics report on May 30, 2017. Pet'r's Memo., filed Feb. 22, 2019, at 1. Mr. Gage stated that the failure to file the report was a "staff oversight." Id. at 2. As discussed below, the Ambry Genetics report presented information that connected a genetic mutation with the conditions for which Ms. Ellis was seeking compensation.

The petitioner's motion for a ruling on the record was denied without prejudice for two reasons. First, Ms. Ellis needed to submit the Ambry Genetics report. Second, the parties could obtain reports from people specializing in genetics. This second suggestion was more directed to Ms. Ellis because Dr. Kinsbourne is not an expert in genetics. Order, issued July 11, 2017.

---

Dr. Kinsbourne withdrew his opinion that the DTaP vaccine contributed to the developmental delay.

4

On behalf of Ms. Ellis, Mr. Gage filed the Ambry Genetics report immediately. Exhibit 58. After some additional commentary from the experts, the parties submitted the case for adjudication.

The decision issued on September 6, 2018, found that Ms. Ellis was not entitled to compensation. <u>Decision</u>, 2018 WL 4846547. The four overlapping reasons were (1) the Secretary established that the likely cause of X.G.'s seizure disorder was either the CMV infection or the MED13L mutation, (2) Dr. Wirrell was more qualified and more credible than Dr. Kinsbourne, (3) the treaters tended to opine that the CMV infection or the MED13 mutation caused X.G.'s problem, and (4) Ms. Ellis did not establish her case.

### C.   Fee Application

Ms. Ellis filed for her attorneys' fees and costs in a motion containing tabs A through L. The fees for her attorneys and paralegals total $71,611.23. The costs total $45,910.21. The General Order #9 statement, signed by Mr. Gage, states that Ms. Ellis incurred no costs personally. Pet'r's Fee Appl., filed Nov. 7, 2018.

The Secretary responded the next day with his stock response. Resp't's Resp., filed Nov. 8, 2018.

Upon taking up the motion, the undersigned determined that the parties had not addressed reasonable basis and good faith and that the parties should address those topics. Thus, the undersigned ordered submissions from the parties. Order, issued Feb. 4, 2019.

Ms. Ellis filed a short memorandum on February 22, 2019. She did not directly address reasonable basis and good faith.

The Secretary filed a similarly short memorandum on February 26, 2019. He asserted that the case lost reasonable basis on May 30, 2017, after counsel reviewed the Ambry Genetics report.

The parties' submissions leave two questions for adjudication. The first question is whether reasonable basis supported Ms. Ellis's petition. This question is addressed in sections III and IV, below. The second question is determining an amount of reasonable attorneys' fees and costs. This question is resolved in section V, below.

### III. Standards for Adjudicating Eligibility for An Award of Attorneys' Fees and Costs

Petitioners who have not been awarded compensation are eligible for an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1). As the Federal Circuit has stated, "good faith" and "reasonable basis" are two separate elements that must be met for a petitioner to be eligible for attorneys' fees and costs. Simmons v. Sec'y of Health & Human Servs., 875 F.3d 632, 635 (Fed. Cir. 2017).

"Good faith" is a subjective standard. Id.; Hamrick v. Sec'y of Health & Human Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she honestly believes that a vaccine injury occurred. Turner v. Sec'y of Health & Human Servs., No. 99-544V, 2007 WL 4410030, at * 5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).

In contrast to good faith, reasonable basis is purely an objective evaluation of the weight of the evidence. Simmons, 875 F.3d at 636. Because evidence is "objective," the Federal Circuit's description is consistent with viewing the reasonable basis standard as creating a test that petitioners meet by submitting evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *12-13 (Fed. Cl. Spec. Mstr. Oct. 25, 2013) (explaining that reasonable basis is met with evidence), mot. for rev. denied, 116 Fed. Cl. 276 (2014).

The Federal Circuit and judges of the Court of Federal Claims have provided some guidance as to what reasonable basis is *not*. A petition based purely on "unsupported speculation," even speculation by a medical expert, is not sufficient to find a reasonable basis. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994). The background to Perreira comes from a 1991 decision denying compensation. The Perreiras alleged that a 1982 administration of the diphtheria-pertussis-tetanus ("DPT") vaccine harmed their daughter, Carly. Initially, the Perreiras maintained that Carly started having seizures four days after the second dose of DPT, based upon the testimony of Carly's mother. The former Chief Special Master found that Ms. Perreira's testimony was not correct and found, instead, that the seizures started 20 days after the second dose of DPT. Perreira v. Sec'y of Health & Human Servs., No. 90-847V, 1991 WL 117740, at *1 & n.2 (Cl. Ct. Spec. Mstr. June 13, 1991).

6

Given this sequence of events, the Perreiras attempted to establish a significant aggravation claim. This alternative claim was based upon the sequence that two weeks after the third dose of DPT, Carly had more seizures. The former Chief Special Master rejected the Perreiras' claim because there was no support for their expert's opinion that DPT causes harm that would first appear two weeks later. Id.

After the entitlement proceedings concluded, the Perreiras sought an award for their attorneys' fees and costs. The former Chief Special Master found that the Perreiras had a reasonable basis for filing their petition. Perreira v. Sec'y of Health & Human Servs., No. 90-487V, 1992 WL 164436, at *2 (Cl. Ct. Spec. Mstr. June 12, 1993). The decision does not state the reason for finding reasonable basis.

The former Chief Special Master explicitly found that the reasonable basis ceased after the expert submitted a report, noting that the expert's theory "amounted to his own unsupported speculation[,]" and that the Perreiras' attorney should have recognized that the expert's theory "was legally insufficient to establish causation." The former Chief Special Master also stated that the Perreiras' attorney recognized that this case "was a 'bad case.'" Id. at *1-2.

The Perreiras filed a motion for review of the denial of a portion of the attorneys' fees and costs. The Court of Federal Claims found that the former Chief Special Master's determination that the case lacked a reasonable basis was not arbitrary. The Court of Federal Claims rejected the petitioners' arguments, including an argument that "counsel had an absolute right to rely on the expert's opinion in pursuing the case." Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 33 (1992).

These decisions are the background for the Federal Circuit's discussion of "reasonable basis" in its Perreira opinion. The Federal Circuit affirmed the former Chief Special Master's decision that the Perreiras lacked a reasonable basis to proceed to a hearing, despite an expert report, because "the expert opinion was grounded in neither medical literature nor studies." The Federal Circuit explained that "[t]he special master did not require counsel to verify the validity of the expert's opinion, but only required the opinion to be more than unsupported speculation." Perreira, 33 F.3d at 1377.

Perreira demonstrates that special masters enjoy discretion to find that a claim lacked a reasonable basis when the evidence on which the petitioners relies (there, an expert's report) is rooted in unsupported speculation. In this context, the

7

Federal Circuit seemed to give some teeth to the term "reasonable basis." The Federal Circuit declared: "Congress must not have intended that every claimant, whether being compensated or not under the Vaccine Act, collect attorneys' fees and costs by merely having an expert state an unsupported opinion." 33 F.3d at 1377.

Another example of a case exemplifying a deeper than skin-deep look at reasonable basis is an early case from the Vaccine Program, Murphy v. Sec'y of Health & Human Servs., No. 90-882V, 1991 WL 74931 (Fed. Cl. Spec. Mstr. Apr. 25, 1991). Today, Murphy is often cited as a well-known case in which a special master weighed the value of medical records created contemporaneously with the events the medical records described against the value of affidavits created many years later. The special master found that the medical records were more reliable, 1991 WL 74931 at *5, and the Court of Federal Claims ruled that this finding was not arbitrary. 23 Cl. Ct. 726, 734 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992). Under the sequence of events presented in the contemporaneously created medical records, the petitioners in Murphy were not entitled to compensation.

A less recognized aspect to Murphy is the ensuing motion for attorneys' fees and costs, which is more relevant to the case at hand. Although the special master's 1993 decision denying an award of attorneys' fees and costs is unpublished, the opinion on a motion for review states the special master found a lack of reasonable basis because "the medical records and other written records contradict the claims brought forth in the petition." 30 Fed. Cl. 60, 61 (1993). Upon a motion for review, the petitioners argued that the special master abused his discretion in denying attorneys' fees and costs. More specifically, the petitioners argued that "because they submitted expert opinion to support their claim, they had a reasonable basis for their case as a matter of law." Id. at 62.

The Court, however, rejected the petitioners' argument and ruled that the special master was not arbitrary in finding a lack of reasonable basis. The Court reasoned that an expert report premised on unreliable assertions does not confer reasonable basis:

> [The petitioners'] position assumes that special masters rely upon expert testimony without determining whether it is corroborated by the facts. This position is not plausible, as expert testimony in and of itself does not determine reasonableness. . .. [T]he expert opinion submitted by petitioners was founded upon Mrs.

8

> Murphy's version of the events, a version found to be unreliable by the special master.

Id. at 63.

Thus, two appellate authorities demonstrate that the presence of a report from a retained expert, by itself, does not establish reasonable basis automatically. Instead, the special masters must weigh the objective evidence.

An objective weighing of the evidence is consistent with cases that have placed the burden of establishing the petition's reasonable basis on petitioners. Carter v. Sec'y of Health & Human Servs., 132 Fed. Cl. 372, 379 (2017) (citing Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148, 152 (2012) and McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 305 (2011)). However, the petitioner's burden is to establish the reasonable basis for the claims set forth in the petition. This burden is not the same as the burden of establishing entitlement to compensation. See Chuisano, 2013 WL 6234660, at *12-13.

## IV.   Analysis of Eligibility for Attorneys' Fees and Costs

With counsel's receipt and review of the Ambry Genetics report on May 30, 2017, the case lost its reasonable basis to proceed on the claim that the vaccines caused X.G. to suffer seizures / epilepsy.[4] The "objective evidence" showed that X.G.'s seizures / epilepsy could be caused by the genetic mutation.

Rather than look to the report from Ambry Genetics, Ms. Ellis and Mr. Gage seem to rely upon the opinion from Dr. Kinsbourne. But, Dr. Kinsbourne's opinion cannot furnish the reasonable basis to proceed in this case with a genetic mutation. When Dr. Kinsbourne read the Ambry Genetics report is not clear. See footnote 3, above. Regardless, Dr. Kinsbourne initially offered the opinion: "The MED13L syndrome does not feature epilepsy as one of its manifestations." Exhibit 57.

The basis of Dr. Kinsbourne's opinion is not clear. It cannot come from Ambry Genetics because its report associated the MED13L mutation with epilepsy.

---

[4] The decision focuses on the reasonable basis to proceed on the theory that the vaccines caused seizures / epilepsy because, on July 5, 2017, Ms. Ellis stopped pursing the theory that the vaccines caused developmental delay. Pet'r's Mot., filed July 5, 2017.

9

Exhibit 58 at 13. It also cannot come from Dr. Kinsbourne's experience because he has not practiced pediatric neurology in decades. See Snyder v. Sec'y of Health & Human Servs., 553 Fed. App'x 994, 1001-02 (Fed. Cir. 2014) (finding in a SCN1A gene case that the special master was not arbitrary in refraining from crediting Dr. Kinsbourne's opinion due to his lack of experience with genetics).

With minimal effort, the undersigned found articles about the MED13L mutation and epilepsy. Court exhibit 1001 (article from website from the National Institute of Health: "Other features of MED13L haploinsufficiency syndrome include . . . recurrent seizures (epilepsy)"). Dr. Wirrell identified additional articles. See exhibit KK.

After this material was filed, Dr. Kinsbourne's opinion changed. He now stated: "The likelihood of a child with a MED13L variant having seizures without further provocation is somewhat elevated relative to the general population, but is far from meeting the more-likely-than-not standard." Exhibit 59 at 2.

In Ms. Ellis's most recent filing in support of an award of attorneys' fees and costs, she seems to overlook Dr. Kinsbourne's final opinion regarding the significance of an MED13L mutation. Similarly, Ms. Ellis asserts that "exhibit 58 [the Ambry Genetics report] adds NOTHING." Pet'r's Memo., filed Feb. 22, 2019, at 2 (capitalization in original).

The undersigned views the Ambry Genetics report differently. As a report prepared outside the context of litigation, the opinion of professionals from Ambry Genetics represents an unbiased view. See Capizzano v. Sec'y of Health & Human Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006) (views of treating doctor are entitled to weight); Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993) (reports prepared during the course of medical treatment are presumed reliable). Here, Ambry Genetics stated: X.G.'s "clinical presentation is possibly consistent with that of previously-reported patients with MED13L alterations." Exhibit 58 at 13. The report continued: "Other features reported in a subset of patients include . . . epilepsy." Id.

Although the February 4, 2019 order directed Ms. Ellis to explain why continued prosecution of her case after the discovery of the genetic mutation was supported by reasonable basis, Ms. Ellis's brief does not use the term "reasonable basis." See Pet'r's Memo., filed Feb. 22, 2019. Ms. Ellis does not cite the two Federal Circuit opinions discussing reasonable basis, Simmons and Perreira. To the extent that Ms. Ellis makes an argument regarding reasonable basis, she seems

10

to rest upon a temporal sequence of events in which the DTaP vaccination preceded the start of seizures. However, a sequence of events is not sufficient. Chuisano, 2013 WL 6234660, at *14. While testing that links a vaccinee's genetics to the vaccinee's disease does not necessarily preclude a finding that a vaccine harmed the recipient, genetic information affects the analysis of causation. See Stone v. Sec'y of Health & Human Servs., 676 F.3d 1373, 1380 (Fed. Cir. 2012) ("in some cases a sensible assessment of causation cannot be made while ignoring the elephant in the room—the presence of compeling evidence of a different caus for the injury in question"). Here, Ms. Ellis did not grapple with the significance of the genetic testing.

Accordingly, for these reasons, Ms. Ellis has failed to meet her burden of establishing that a reasonable basis supported the continued prosecution after May 30, 2017. This finding results in the elimination of attorneys' fees (including paralegal fees) of $10,138.40. However, Ms. Ellis did possess reasonable basis for the claims set forth in her petition until May 30, 2017. Thus, an award of reasonable attorneys' fees and costs for this period is appropriate. The next question is the time in which reasonable basis supported the claim set forth in the petition, what is a reasonable amount of attorneys' fees and costs?

## V. Determining a Reasonable Amount of Attorneys' Fees and Costs

The Vaccine Act permits an award of reasonable attorney's fees and costs. §15(e). The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. This is a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008). First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348.

### A. Reasonable Hourly Rates

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation. Avera, 515 F.3d at 1349. There is, however, an exception (the so-called Davis County exception) to this general rule when the bulk of the work is done outside the District of Columbia and the attorneys' rates are substantially lower. Id. 1349 (citing Davis Cty. Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot.

Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)). In this case, all the attorneys' work was done outside of the District of Columbia.

Ms. Ellis requested compensation for her attorney-of-record, Richard Gage, and four associate attorneys, Kristine Blume, Don Gerstein, Kristen Rieman, and Dustin Lujan.

Mr. Gage charged rates from $265/hour in 2012 to $326/hour in 2018. Pet'r's Fees Appl., Tab C. The undersigned has recently evaluated Mr. Gage's rates and found them reasonable. Lewis v. Sec'y of Health & Human Servs., No. 14-1035V, 2018 WL 6650362, at *2 (Fed. Cl. Spec. Mstr. Nov. 19, 2018). Although the undersigned has previously found Mr. Gage's rates to be reasonable, his work on this case was poor. Overall, the case progressed slowly, with notable delays in obtaining expert reports. Mr. Gage did not engage on important issues, such as responding promptly to the Secretary's assertion in the Rule 4 report that the CMV infection caused X.G.'s injuries. His office did not timely file key genetic tests upon receipt when those tests contributed to the outcome on entitlement. Mr. Gage did not notice that Dr. Kinsbourne cited the wrong exhibit in one of his reports and Mr. Gage then included this incorrect citation in his brief on entitlement.[5] This oversight raises the question of whether Mr. Gage was reading the medical literature that he was citing. For these deficiencies in his performance in this case, Mr. Gage's hourly rates will be reduced by 5%.

Ms. Blume charged an hourly rate of $251 for her work done in 2017 and 2018. Pet'r's Fees Appl., Tab D. The undersigned has previously found these rates for Ms. Blume to be reasonable. Lewis, 2018 WL 6650362, at *2.

Mr. Gerstein charged rates from $265/hour in 2012 to $285/hour in 2014. Pet'r's Fees Appl., Tab F. Ms. Ellis has not cited any cases in support of Mr. Gerstein's rates. Other special masters have found a reasonable rate for Mr. Gerstein in 2014 to be $250/hour. Boman v. Sec'y of Health & Human Servs., No. 15-256V, 2017 WL 7362539, at *4 (Fed. Cl. Spec. Mstr. Sept. 20, 2017). The undersigned concurs with this rate for 2014, and, accordingly, Mr. Gerstein's hourly rates for 2012 and 2013 will also be reduced to $250.

---

[5] In short, the article cited by Dr. Kinsbourne did not support the proposition for which it was cited. See May 15, 2018 order.

Ms. Rieman charged an hourly rate of $200 for her work done in 2017. Pet'r's Fees Appl., Tab G. The undersigned and other special masters have previously found a rate of $150 for Ms. Rieman to be reasonable. Martin v. Sec'y of Health & Human Servs., No. 13-486V, 2019 WL 2173794, at *3 (Fed. Cl. Spec. Mstr. Apr. 23, 2019) (citing Pember v. Sec'y of Health & Human Servs., No. 15-1005V, 2018 WL 3989514, at *2 (Fed. Cl. Spec. Mstr. June 28, 2018); Briggs v. Sec'y of Health & Human Servs., No. 15-737V, 2018 WL 3991261, at *4 (Fed. Cl. Spec. Mstr. June 27, 2018)).

Mr. Lujan charged an hourly rate of $150 for his work done in 2015. Pet'r's Fees Appl., Tab I. Because Mr. Lujan became a licensed attorney around September 4, 2015, the undersigned previously found that he would be granted an hourly rate of $90 before that date and an hourly rate of $107.25 after that date. Lewis, 2018 WL 6650362, at *2.

Ms. Ellis also requested compensation for various paralegals at Mr. Gage's firm who charged rates ranging from $112 to $120 per hour for work done from 2012-2018. Pet'r's Fees Appl., Tab J. The undersigned has previously found these paralegal rates for Mr. Gage's firm to be reasonable. Lewis, 2018 WL 6650362, at *2.

### B. Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary. See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). The Secretary also did not directly challenge any of the requested hours as unreasonable. Initially, in light of the reasonable basis determination detailed above, Ms. Ellis is not eligible for reimbursement of attorneys' fees and costs after May 30, 2017. For the hours worked while the case had reasonable basis, the time entries are evaluated as follows.

As noted in previous fee decisions, time entries from Mr. Gage and his associates hinder the evaluation of reasonableness. Lewis, 2018 WL 6650362, at *3 (citing Pember, 2018 WL 3989514). Mr. Gage and his associates repeatedly bill for "file review" and "medical research" without any additional context. In line with those previous decisions, Mr. Gage's and his associates' hours are reduced by 5% for the vagueness of their time entries.

13

The time entries for the paralegals contain a bit more detail than those entries for the attorneys. Moreover, because the tasks performed by the paralegals are simpler, that additional detail results in a more accurate description of the work performed. The undersigned finds the number of hours for the paralegals to be reasonable.

Accordingly, Ms. Ellis is awarded attorneys' fees in the amount of $55,661.35.

### C. Costs Incurred

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Ms. Ellis requested a total of $45,910.21 in attorneys' costs, attributable to acquiring medical records, acquiring medical literature, postage, and the services for three experts. Ms. Ellis's routine litigation costs totaled $2,035.21. For the non-expert related costs, the undersigned finds that Ms. Ellis has provided adequate documentation for these costs and will award them in full. For the expert costs, as noted in the previous section, Ms. Ellis failed to establish the reasonable basis for her claim after May 30, 2017. This finding makes Ms. Ellis ineligible for reimbursement of expert work after May 30, 2017.

For the experts, Ms. Ellis requested compensation for the expert fees of Dr. Marcel Kinsbourne ($31,125.00), Dr. Karen Harum ($12,500.00), and Dr. Patrick Barnes ($250.00). Reasonable expert fees are also determined using the lodestar method in which a reasonable hourly rate is multiplied by a reasonable number of hours. See Chevalier v. Sec'y of Health & Human Servs., No. 15-001V, 2017 WL 490426, at *3 (Fed. Cl. Spec. Mstr. Jan. 11, 2017).

Dr. Kinsbourne billed 62.25 hours of work at a rate of $500 per hour for the preparation of expert reports. Pet'r's Fee Appl., Tab K at pdf 32-35. Dr. Kinsbourne billed 11.7 hours after May 30, 2017, resulting in an initial deduction of $5,850.00. A reasonable hourly rate for an expert depends, in part, on the quality of the expert's work. Sabella v. Sec'y of Dep't of Health & Human Servs., 86 Fed. Cl. 201, 218-25 (2009). Here, although Dr. Kinsbourne has been compensated at $500 per hour in some cases, see Jaafar v. Sec'y of Health & Human Servs., No. 15-267V, 2019 WL 2265329, at *4 (Fed. Cl. Spec. Mstr. Apr. 26, 2019), that rate is excessively high for the quality of work in this case. Dr. Kinsbourne performed poorly in this case. In his first expert report, which was

14

only 3 ½ pages long, he did not address two of X.G.'s key medical issues, the CMV infection and his microencephaly, that the Secretary raised in his Rule 4 report. In his second report, Dr. Kinsbourne minimally addressed these issues in a 1 ½ page submission. Because Dr. Kinsbourne could not properly address the CMV infection, Ms. Ellis retained Dr. Harum to address that issue. Dr. Kinsbourne's third report answering questions from the expert instructions, that were previously ignored, was approximately one page. Dr. Kinsbourne later required consultation with Dr. Barnes to review some MRI's. In light of this performance, Dr. Kinsbourne's hourly rate is reduced to $300.

The reduction in hourly rate also is based, in part, on the poor invoices that Dr. Kinsbourne created. Dr. Kinsbourne's invoice lacks detail by listing activities done within a month rather than identifying which activities were done on a particular day. The descriptions of his time entries are vague and contain few words. Dr. Kinsbourne has numerous vague time entries of "teleconference," lacking details with whom he is communicating and about what he is communicating. It is difficult to even speculate on the nature of the teleconferences because Dr. Kinsbourne has often not performed any identifiable work between the teleconferences. Rather than separately reduce the number of hours for vague entries, the undersigned has folded the deduction for poor invoices into the hourly rate. For all these reasons, Dr. Kinsbourne's expert fees are awarded in the amount of $10,110.00.

Dr. Harum billed 31.25 hours of work at a rate of $400 per hour for the preparation of expert reports. Pet'r's Fee Appl., Tab K at pdf 22. None of the time billed by Dr. Harum occurred after May 30, 2017. Another special master has awarded Dr. Harum's expert fees in full. Pope v. Sec'y of Health & Human Servs., No. 14-78V, 2017 WL 5380926, at *3 (Fed. Cl. Spec. Mstr. Sept. 11, 2017). The undersigned finds the amount Dr. Harum charged for expert reports to be reasonable. Thus, Dr. Harum's expert fees are awarded in full.

Dr. Barnes, a pediatric neuroradiologist, billed 0.5 hours of work at a rate of $500 per hour for the review of X.G.'s imaging studies. Pet'r's Fee Appl., Tab K at pdf 29. None of the time billed by Dr. Barnes occurred after May 30, 2017. The undersigned finds the amount Dr. Barnes charged for this discrete task to be reasonable. Thus, Dr. Barnes's expert fees are awarded in full.

In sum, petitioner is awarded attorneys' costs in the amount of $24,895.21.

## VI. Conclusion

The Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e).  Accordingly, Ms. Ellis's motion for attorneys' fees and costs is **GRANTED** to the extent that she is awarded a total of $80,556.56 (representing $55,661.35 in attorneys' fees and $24,895.21 in attorneys' costs). This shall be paid as follows:

> **A lump sum payment of $80,556.56 in the form of a check made payable jointly to petitioner and petitioner's attorney, Richard Gage for all attorneys' fees and costs available under 42 U.S.C. § 300aa-15(e).**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[6]

**IT IS SO ORDERED**.

s/Christian J. Moran<br>
Christian J. Moran<br>
Special Master

---

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.